IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| D.S., by and through | ) | |
| his guardian ad litem | ) | |
| and next friend, | ) | |
| Trina Williams, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:04cv396-MHT |
| | ) | (WO) |
| COUNTY OF MONTGOMERY, | ) | |
| STATE OF ALABAMA; | ) | |
| MILTON WEBB; | ) | |
| CHARLIE TERRELL; | ) | |
| DARRYL ANDREWS; | ) | |
| AND NATALIE JOHNSON, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

This case arises out of the rape of plaintiff D.S.,
by another juvenile detainee, when he was 11 years old
and in the custody of the Montgomery County Youth
Facility ("MCYF").  D.S., by and through his guardian ad
litem and next friend Trina Williams, now names as
defendants Montgomery County, Alabama and four MCYF
employees: Milton Webb, Charlie Terrell, Darryl Andrews,
and Natalie Johnson Mason.

D.S. asserts two claims against the defendants:  (1)
they violated his right to substantive due process under
the Due Process Clause of the Fourteenth Amendment of the
United States Constitution, as enforced through 42 U.S.C.
§ 1983; and (2) they were negligent, grossly negligent,
wanton, and reckless, in violation of Alabama law.

Jurisdiction over this case, which was removed from
state court, is proper pursuant to 28 U.S.C. §§ 1331
(federal question), 1343(a)(3) and (4) (civil rights),
1367 (supplemental), and 1441 (removal).  This case is
now before the court on the defendants' motion for
summary judgment.  The motion will be granted in part and
denied in part.

## I.  SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show that
there is no genuine issue as to any material fact and

2

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).


## II.  BACKGROUND

MCYF is a youth-detention facility operated by the Montgomery County, Alabama.  Either a parent, social-services agency, or law-enforcement officer may commit a juvenile to MCYF custody if there is probable cause to

3

charge the juvenile with a criminal offense or delinquency.[1]

On April 14, 2002, D.S.'s grandmother and aunt brought him to MCYF for repeatedly striking his mother and stealing money from his grandmother's purse. During the initial interview, D.S.'s family informed defendant Mason, who was the intake officer on duty, that D.S. was mentally ill and mildly retarded. Mason noted on the complaint that accompanied D.S.'s intake documents that D.S. was taking prescriptions for Paxil and Risperdal and recommended that he should see a court-appointed mental-health therapist.[2]

---

1. By exception, juveniles who are at least 16 years old and arrested, charged or tried as an adult pursuant to 1975 Ala. Code § 12-15-34.1, are not detained at MYDF but, instead, are held at an adult facility.

2. Defendants' evidentiary submission in support of motion for summary judgment (Doc. No. 68), exhibit 6, Mason deposition, exhibit 4 attached thereto. PAXIL® (paroxetine HCl) is a prescription medication that has been approved by the U.S. Food and Drug Administration (FDA) for treatment of depression, generalized anxiety disorder, social anxiety disorder, panic disorder, obsessive compulsive disorder, and posttraumatic stress

(continued...)

After interviewing D.S. and his family, Mason concluded that there was probable cause to charge him with criminal conduct. The following day, a juvenile court ordered D.S.'s continued custody at MCYF as a pretrial detainee.

The MCYF detention unit includes three wings of single-occupancy cells: all females are placed on A-wing; males ages seven to 14 are generally placed on B-wing; and males ages 15 to 18 are generally placed on C-wing. Although age and gender are the primary placement considerations, a detainee's gang affiliation, if any, and physical size are also considered. Suicidal juveniles, because they pose a danger to themselves, are

_____

2. (...continued)
disorder. Official Paxil Website: What Does Paxil Treat <http://www.paxil.com/about/ab_trt.html> (accessed on February 15, 2005). RISPERDAL® (risperidone) is a prescription medication that has been approved by the FDA for treatment of bipolar I disorder and acute to manic or mixed episodes associated with bipolar I disorder. Official Risperdal Website: About Risperdal <http://www.risperdal.com/html/ris/consumer/pd_risperid one.xml;jsessionid=GIFNQZVEDYPPWCQPCCFTC0YKB2IIQNSC?art icle=index_risperidone.jspf> (accessed on February 15, 2005).

subject to increased surveillance while in their cells but otherwise remain in general population.  There are no placement considerations for physically or mentally handicapped juveniles, and there are no placement considerations for non-gang affiliated juveniles who may otherwise pose a danger to others.

Because of his sex, age, physical size, and lack of gang affiliation, D.S. was assigned to a cell on B-wing. When D.S. was admitted, MCYF employees were directed to "keep a close eye on him."  Defendants' evidentiary submission in support of motion for summary judgment (Doc. No. 68), exhibit 4 attached to Howell deposition transcript.

A dayroom, where detainees participate in various educational and recreational activities, is located on B-wing.  Because of the admitted need to watch juveniles at all times, there is, immediately adjoining the dayroom, a control room where MCYF childcare officers use sound-amplification equipment and a glass wall to monitor

detainees.  At least one childcare officer must be in the control room at all times when the dayroom is occupied.

A boys' restroom facility is adjacent to the dayroom and the control room.  Again, because of the need for constant supervision of all juveniles, only one detainee is permitted in the restroom at a time; the restroom door does not have a lock on it; and there is a 8" by 16" observation window in the common wall between the restroom and control room, and, from the window, a childcare officer can hear and, if necessary, observe a detainee in the restroom.  However, detainees frequently cover the window with toilet paper and other debris to prevent MCYF staff from observing them while they are in the restroom.

On April 18, in the late morning, D.S. and another detainee, C.P., were playing cards in the dayroom. Defendants Webb, Terrell, and Andrews were the childcare officers assigned to B-wing and, therefore, were

immediately responsible for constantly monitoring, supervising, and protecting D.S. and C.P. in the dayroom.

At some point during the card game, D.S. went to the restroom; the childcare officers could not, however, see into the restroom because toilet paper covered the window between the control room and the restroom. Shortly thereafter, C.P. entered the restroom with his "private out," grabbed D.S., and raped him. During the assault, which lasted approximately five minutes, D.S. yelled for MCYF staff. While the restroom was constructed in a way so that yells from it could be heard in the control room, no one responded. D.S. cries for help did, however, cause C.P. to end the assault. D.S. ran out of the restroom and darted toward the control room to notify staff. C.P. grabbed D.S., threw him against the dayroom wall, and threatened future harm if D.S. reported the assault. When D.S. left the restroom, he looked into the control room and saw two childcare officers; one was

reading a newspaper, and the other appeared to be doing something on a computer; neither looked up.

It appears that D.S. is confused as to who was on duty during the incident. He says that Webb was present. He also says that a "Calhoun" was present, but MYYF records indicate that Officer Calhoun was not on duty that day. In any event, Webb, Terrell, and Andrews all admit the incident occurred on their shift. They were therefore on duty and thus were directly responsible for D.S.'s supervision and safety.

At approximately 11:40 a.m., two the childcare officers took D.S. to the cafeteria for lunch. While standing in the lunch line, D.S. reported the rape to one of the officers.[3] However, no childcare officer documented D.S.'s first report of the rape in the daily logbook. In fact, D.S.'s behavior log for April 18 indicates that there was "no problem" during the staff's

---

3. There is no reasonably reliable evidence that it was to either Webb, Terrell, or Andrews that D.S., while in the lunch line, reported the rape

9

first shift.   Defendants' evidentiary submission in
support of motion for summary judgment (Doc. No. 68),
exhibit 2, Howell deposition, plaintiff's exhibit 4
attached to deposition transcript.[4]

After lunch, D.S. was returned to the B-wing dayroom.
Shortly thereafter, at approximately 12:00 p.m., D.S.
reported the rape to defendant Mason, and she immediately
directed MCYF staff to take D.S. to the doctor.   D.S. was
not taken to a doctor, however.   Again, there is no
documentation of D.S.'s second report of the rape.

After dinner and a shift change in MCYF staff, at
approximately 6:00 p.m., D.S. reported the rape for a
third time to a childcare officer; the officer, in turn,
notified the MCYF director and a physician.[5]   D.S. was
transported to the hospital at approximately 7:35 p.m.,

---

4.   The court cannot decipher the signature of the
childcare officer on duty during the first shift who made
this notation in D.S.'s chart.

5.   The child care officer to whom D.S., for a third
time, reported the rape has not been named as a defendant
to this lawsuit.

seven hours after he first reported the rape.  Hospital records from a rape examination indicate that D.S. suffered rectal tears, discharge, and bleeding as a result of the incident.


## III.  DISCUSSION

D.S. contends that the defendants' conduct violated his federal substantive-due-process right and Alabama law.  The court will discuss D.S.'s federal claims separately from his state claims.


## A.  Federal Claim

To establish a claim under § 1983, D.S. must demonstrate that the defendants, acting under color of law, deprived him of some right protected by the United States Constitution.  County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998).  D.S. rests his § 1983 claim on the Due Process Clause of the Fourteenth Amendment contending that the defendants were deliberately

indifferent to detention conditions that posed a substantial risk of serious harm to him.[6]


### 1. Webb, Terrell, and Andrews

D.S. sued MCYF employees Webb, Terrell, and Andrews in their individual capacities, asserting that, in failing to protect from being raped, they were deliberately indifferent to conditions posing a substantial risk of serious harm to him. In Webb, Terrell, and Andrews's summary-judgment motion, they assert qualified immunity.

Qualified immunity shields a public employee from liability for acts or omissions arising out of the

---

6. Generally, the Eighth Amendment is the appropriate mechanism to challenge unconstitutional conditions of incarceration. Because D.S. "was a detainee and not a prisoner, however, his constitutional rights arise not from the Eighth Amendment, but from the Due Process Clause of the Fourteenth Amendment." Hale v. Tallapoosa County, 50 F.3d 1579, 1582 n.4 (11th Cir. 1995).

employee's discretionary authority.[7]   The qualified-immunity defense is based on the policy that public employees sued for monetary damages under § 1983 have a right to fair notice that a given course of conduct is unlawful.  <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001).  A public employee who successfully establishes the qualified-immunity defense is entitled to summary judgment to avoid the burdens and costs associated with civil litigation.  <u>Edwards v. Gilbert</u>, 867 F.2d 1271, 1273 (11th Cir. 1989).

The Supreme Court has synthesized its qualified-immunity precedent into a two-pronged framework.  <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002); <u>Saucier</u>, 533 U.S. at 201; <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  First, a court must determine whether the evidence, construed in the plaintiff's favor, establishes a constitutional

---

7.  The parties agree that the MCYF employees were acting within the scope of their discretionary authority under Alabama law when the allegedly unconstitutional conduct occurred.  <u>See</u>, <u>e.g.</u>, <u>Sims v. Metropolitan Dade County</u>, 972 F.2d 1230, 1236 (11th Cir. 1992).

violation; the court should not merely assume that the plaintiff has adequately asserted a violation of some constitutional right.  Scott v. Harris, 127 S. Ct. 1769, 1774 (2007); Siegert v. Gilley, 500 U.S. 226, 231 (1991); Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003).

If the evidence adequately alleges a constitutional violation, the court must then determine whether the defendant's acts or omissions transgressed clearly established statutory or constitutional law of which a reasonable person would have known.  Hope, 536 U.S. at 737.

This second element entails both objective and subjective components.  Objectively, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Subjectively, the court assesses the evidence in light of facts that the defendant knew, or should have known, but deliberately disregarded when alleged

14

constitutional violation occurred.  <u>Dolihite v. Maughon</u>, 74 F.3d 1027, 1041 (11th Cir. 1996).  A public employee who is unaware of facts or circumstances that make his or her conduct unconstitutional lacks the necessary forethought for deliberate indifference.  As such, "the relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred."  <u>Id</u>.

As to the first element of the qualified-immunity analysis, D.S. has adequately set forth a constitutional violation arising out of the rape of him.  A government official's failure to protect prisoners from violence committed at the hands of other prisoners transgresses the constitutional limits of punishment.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  This principle is considerably more imperative when the individual is a

young child who is committed to the government's custody for pretrial detention.   Surely, "if it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional under the Due Process Clause to confine the involuntarily committed-- who may not be punished at all--in unsafe conditions." Youngberg v. Romero, 457 U.S. 307, 315-16 (1982).

As to the objective component of the second element, therefore, D.S.'s right to be free from sexual assaults was clearly established at the time when the alleged violation occurred.   "[T]he right to personal security constitutes a historic liberty interest protected substantively by the Due Process Clause."   Id. at 315 (internal quotations omitted); see also Thomas v. City of Clanton, 285 F. Supp.2d 1275, 1280 (M.D. Ala. 2003) (Thompson, J.) ("a right to be free from sexually motivated assaults [because] substantive due process under the fourteenth amendment includes a right to bodily integrity") (citing Romero v. City of Clanton, 220 F.

Supp.2d 1313, 1316 (M.D. Ala. 2002) (Albritton, J.));
Johnson v. Cannon, 947 F. Supp. 1567, 1572-73 (M.D. Fla.
1996) (Kovachevich, J.); Battista v. Cannon, 934 F. Supp.
400, 405 (M.D. Fla. 1996) (Kovachevich, J.)).   It is
obvious that the right to bodily integrity is not lost
when a child enters a governmental entity's custody.
"[W]hen the State by the affirmative exercise of its
power so restrains an individual's liberty that it
renders him unable to care for himself, and at the same
time fails to provide for his ... reasonable safety--it
transgresses the substantive limits on state action set
by the ... Due Process Clause." DeShaney v. Winnebago
County Dept. of Social Servs., 489 U.S. 189, 200 (1989).

As to the subjective component of the second element,
to establish that Webb, Terrell and Andrews were
deliberately indifferent, D.S. must demonstrate that (1)
the childcare officers were aware of facts that created
a substantial risk of serious harm to him; (2) the
childcare officers' conduct when he was assaulted

17

constituted deliberate indifference to such harm; and (3), absent the childcare officers' conduct, the infirm condition--that is, the excessive risk of sexual abuse--would not have existed. Purcell ex rel. Estate of Morgan v. Toombs County, 400 F.3d 1313, 1319-20 (11th Cir. 2005).

Webb, Terrell, and Andrews admit that D.S. testified that MCYF staff were aware that C.P. had thrown shoes at him and punched him and that a notation in D.S.'s behavior log indicated that, on April 16, two days before the rape, a MCYF staff member warned D.S. and C.P. that they should stop playing together; D.S. also says that MCYF staff were aware that C.P. had threatened to have sex with a "14-year-old white boy" and the staff told "C.P. that he better stop having sex with the white boys." Webb, Terrell, and Andrews argue, however, that there is insufficient evidence that they were aware that C.P. presented a serious danger to D.S.; they point to portions of D.S.'s other testimony in which he states

that he does not remember the staff members' names who saw C.P. hit him or heard C.P. make sexually motivated threats to another detainee.[8]

Webb, Terrell, and Andrews misperceive the nature of the constitutional violation with which they have been charged.  The evidence reflects that Webb, Terrell, and

---

8.  In his affidavit, D.S. asserts the following facts:

> "From April 14, 2002 to April 18, 2002, the date I was sexually assaulted by C.P., C.P. had thrown shoes at me on several different occasions, and had punched me in the back. Staff were aware of these incidents, as a staff member saw C.P. throw a shoe at me, and I also reported being punched by C.P. to staff. I do not recall the names(s) of the staff member witnessing the shoe throwing incident or the staff member I reported the punching incident to ... [S]taff assigned to B-wing were informed that C.P. was threatening to have sex with a fourteen year old white boy in B-Wing ... I recall staff telling C.P. that he better stop having sex with the white boys."

Plaintiff's submission of evidentiary materials in opposition to defendants' motion for summary judgment (Doc. No. 91), exhibit 15, D.S. affidavit.

Andrews had the direct and immediate responsibility as on-duty childcare officers to monitor, supervise, and protect D.S. and C.P. at all times while they were in the daycare room and that they abdicated this responsibility totally:  they failed to notice that D.S. and C.P. had left the daycare room; they failed, despite the one-person-only-in-the-restroom rule, to prevent D.S. from following D.S. into the restroom; they failed to remove the toilet paper that covered the window between the restroom and the control room and thus blocked their view; they failed to respond to D.S.'s yells for help, despite the fact, as they admit, that the yells should have been audible in the control room; and, when D.S. and C.P. left the restroom, they were either reading the paper or working on a computer.  The evidence, read in D.S.'s favor, shows that C.P. was able to rape D.S. only because of Webb, Terrell, and Andrews's total dereliction of their duty to monitor, supervise, and protect to the

20

two boys at all times--and thus shows that D.S.'s rape can be laid squarely at their feet.

This case does not necessarily turn on Webb, Terrell, and Andrews's failure to predict C.P.'s behavior but rather on their failure to meet their day-to-day constitutional responsibility, while on duty at MCYF, to supervise and protect D.S. while he was in their direct custody.   Or, to put it another way, regardless as to whether they were aware of C.P.'s aggressive and inappropriate propensities, they still had a day-to-day constitutional responsibility, while on duty at MCYF, to supervise and protect D.S. while he was in their direct custody, and as far as the court can tell from the current record, they grossly and inexcusably failed to meet this responsibility.

A factfinder could reasonably conclude that, while D.S. was under Webb, Terrell, and Andrews's direct care, they were deliberately indifferent to D.S.'s welfare when D.S. was raped.   Because the court concludes that

defendants Webb, Terrell, and Andrews are not entitled to qualified immunity, the childcare officers' summary-judgment motion will be denied on D.S.'s federal claim.

## 2. Mason

D.S.'s failure-to-protect claim against Mason fails with respect to the subjective component of the second element.  A public employee violates a pretrial detainee's right to substantive due process if the employee deliberately fails to abate a serious risk of substantial harm to the detainee.  While it appears that there were only the most rudimentary segregation criteria in place when D.S. was detained and that there were no special placement considerations for violent, mentally ill, or mentally retarded detainees, Mason was not responsible for assigning D.S. to a particular MCYF wing or for his care thereafter; that task was delegated to others.  Mason was, at most, responsible for recommending further psychiatric evaluation of D.S., which she did in

this case.    The evidence does not support the conclusion that, within the confines of her job and her authority, she was indifferent to D.S.'s welfare at the time of D.S.'s rape.

### 3.  Montgomery County

A local government may be held liable under § 1983 when execution of a government's policy or custom is responsible for inflicting the injury such that the government acts as "the moving force of the constitutional violation."    <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 694 (1978).

D.S. asserts a § 1983 claim against Montgomery County for failing to develop and implement procedures or policies reasonably designed to protect him from being sexually assaulted.

The county responds that D.S. has failed to "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental

actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." McMillian v. Monroe County, 520 U.S. 781, 785 (1997) (internal quotations omitted). In further support of its summary-judgment argument, the county has presented evidence that detainee-on-detainee violence at MCYF is rare.

D.S. does not respond to the county's summary-judgment argument or rebut its evidence in his responsive brief or the pretrial hearing order. Despite the bare allegation in his complaint, D.S. has failed to provide any evidence to support his claim that Montgomery County, through its policies or practices, or lack thereof, deprived him of substantive due process. Moreover, there is insufficient evidence creating a causal connection between the county's responsibilities and the assault. Monell, 436 U.S. at 691. Essentially, it appears that D.S. has abandoned his § 1983 failure-to protect claim

against the county.  Summary judgment will be granted as to the county on D.S.'s federal claim.

## B.  State Claims

D.S. asserts that the defendants were negligent, reckless, grossly reckless, and wanton misconduct in violation of Alabama law.  More precisely, D.S. points out three aspects of his detention as tortious: (1) placing him in the general detention population; (2) failing to supervise and protect him; and (3) failing to provide prompt medical attention after he was raped.[9]  In response, Webb, Terrell, Andrews, and Mason argue that they are entitled to statutory immunity (1975 Ala. Code § 6-5-338(a)) and state-agent common-law immunity. Montgomery County argues that, because D.S.'s claims against it rest solely on respondeat-superior theory, it

_____

9.  While it appears from D.S.'s brief that he has three state claims against the defendants (placement-in-general-population claim, failure-to-protect claim, and failure-to-provide-prompt-medical-care claim), it appears that he is pursuing only one federal claim, a failure-to-protect claim, against the defendants.

too is immune from tort liability because its agents are
entitled to immunity.


### 1. Webb, Terrell, and Andrews

Section 6-5-338(a) provides in pertinent part:

> "(a) Every peace officer ... employed
> ... by ... a county ... shall at all
> times be deemed to be officers of this
> state, and as such shall have immunity
> from tort liability arising out of his
> or her conduct in performance of any
> discretionary function within the line
> and scope of his or her law enforcement
> duties."

1975 Ala. Code § 6-5-338(a).  "Whether a qualified peace
officer is due § 6-5-338(a) immunity is now judged by the
restatement of State-agent immunity articulated by Ex
parte Cranman, 792 So.2d 392 (Ala. 2000)."  Hollis v.
City of Brighton  885 So.2d 135, 142-43 (Ala. 2004).[10]

_____

10.  Cranman provides that:

> "A State agent shall be immune from
> civil liability in his or her personal
> capacity when the conduct made the basis
> of the claim against the agent is based
> upon the agent's

(continued...)

26

10.  (...continued)
(1)  formulating  plans,  policies,  or designs; or

(2)  exercising  his  or  her  judgment  in the  administration  of  a  department  or agency of government, including, but not limited to,  examples such as:

(a)    making    administrative adjudications;

(b)  allocating  resources;

(c)  negotiating  contracts;

(d)    hiring,    firing, transferring,  assigning,  or supervising personnel; or

(3)  discharging  duties  imposed  on  a department  or  agency  by  statute,  rule, or  regulation  insofar  as  the  statute, rule,  or  regulation  prescribes  the manner for performing the duties and the State  agent  performs  the  duties  in  that manner; or

(4)    exercising    judgment    in    the enforcement  of  the  criminal  laws  of  the State,  including,  but  not  limited  to, law-enforcement  officers'  arresting  or attempting  to  arrest  persons  [emphasis added]; or

(5) exercising judgment in the discharge

(continued...)

27

Therefore, for both § 6-5-338(a) immunity and state-agent immunity, the court need look to only <u>Cranman</u> and its progeny.

<u>Cranman</u> has been interpreted to establish a burden-shifting analysis.  <u>Ex parte Alabama Dept. of Mental Health and Mental Retardation</u>, 937 So.2d 1018, 1023-24

---

10.  (...continued)
of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent <u>shall not</u> be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a government agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."

792 So.2d at 405.

(Ala. 2006).   In order to establish immunity from a
claim, the defendant seeking to assert the defense must
present evidence indicating that the claim arises from
conduct that falls within a category giving rise to
immunity, id. at 1024; if this burden is met, the burden
then shifts to the plaintiff to show that the defendant
acted in a manner that precludes application of the
immunity.   Id.; see Cranman, 792 So.2d at 405 ("a State
agent shall not be immune from civil liability in his or
her personal capacity ... when the State agent acts
willfully, maliciously, fraudulently, in bad faith,
beyond his or her authority, or under a mistaken
interpretation of the law").

Webb, Terrell, and Andrews contend that they fall
within the third and fourth categories for immunity set
forth in Cranman,[11] as later amended by Hollis v. City of
Brighton (Hollis II), 950 So.2d 300, 309 (Ala. 2006).[12]

---

11.  See infra note 10.

12.  In Hollis II, the Alabama  Supreme Court wrote
                                     (continued...)

29

These categories are that:

> " A State agent <u>shall</u> be immune from
> civil liability in his or her personal
> capacity when the conduct made the basis
> of the claim against the agent is based
> upon the agent's
>
>               ***
>
> (3) discharging duties imposed on a
> department or agency by statute, rule,
> or regulation insofar as the statute,

---

12. (...continued)
that, "Because the peace officers' immunity statute does
not limit the availability of immunity to 'enforcement of
the criminal laws,' we today modify category (4) of
<u>Cranman</u> to read as follows:

> 'A State agent <u>shall</u> be immune from
> civil liability in his or her personal
> capacity when the conduct made the basis
> of the claim against the agent is based
> upon the agent's
>
> ...
>
> (4) exercising judgment in the
> enforcement of the criminal laws of the
> State, including, but not limited to,
> law-enforcement officers' arresting or
> attempting to arrest persons, or serving
> as peace officers under circumstances
> entitling such officers to immunity
> pursuant to § 6-5-338(a), Ala.Code
> 1975.'"

950 So.2d at 309.

> rule, or regulation prescribes the
> manner for performing the duties and the
> State agent performs the duties in that
> manner; or
>
> (4) exercising judgment in the
> enforcement of the criminal laws of the
> State, including, but not limited to,
> law-enforcement officers' arresting or
> attempting to arrest persons, or serving
> as peace officers under circumstances
> entitling such officers to immunity
> pursuant to § 6-5-338(a), Ala. Code
> 1975."

Cranman, 792 So.2d at 405, as modified by Hollis, 950 So.2d at 309.

Webb, Terrell, and Andrews argue, with regard to D.S.'s state failure-to-protect claim, that they are entitled to § 6-5-338(a) and state-agent immunity because they "discharged their duties pursuant to statu[t]e, facility rules and [American Correctional Association] regulations in the manner in which these rules were prescribed." Defendants' brief (Doc. No. 69), p.37. Relying on Cranman, they contend that, "At the time of the incident, [they] were engaged in discretionary functions under the 3rd and 4th categories ... and are

thus entitled to state-agent immunity." <u>Id</u>. They explain that, "As child care officers, [they] are responsible for supervising the youths in detention and for security in the detention area," and that, "In doing so, [they] are responsible for making reasoned decisions based on the given situation that occurs with the residents." <u>Id</u>.

Webb, Terrell, and Andrews misunderstand the import the Alabama Supreme Court has given <u>Cranman</u>. In <u>Ex parte Alabama Dept. of Mental Health and Mental Retardation</u>, defendants Johnson and Marshall, two employees of the Alabama Department of Mental Health and Mental Retardation (DMHMR), asserted that they are entitled to state-agent immunity, even though they had failed to intervene in an incident in which plaintiff, a DMHMR resident, had been assaulted by another resident. Johnson and Marshall stated that, "in not intervening in the incident ... they were merely discharging the duties imposed on them." 937 So.2d at 1028. The court

32

criticized this contention, stating that Johnson and
Marshall failed to "support ... their conclusory
statements with specific facts regarding their failure to
become involved in [the] assault," id., "nor do they,"
according to the court, "demonstrate that in refusing to
interfere they were adhering to a specific rule or
regulation applicable to the incident." Id. The court
summarized that, "when a defendant asserting State-agent
immunity 'states in conclusory terms that his duties
required him to exercise his judgment and discretion[,]
... yet fail[s] to state his involvement or his adherence
to a rule or regulation governing the exercise of his
duties, in the actions underlying the claims asserted
against him,' there was insufficient evidence to support
a conclusion that the defendant was entitled to
State-agent immunity." Id. (quoting Ex parte Wood, 852
So.2d at 711-12.) The court then concluded that "Johnson
and Marshall failed to carry their burden of establishing
that their conduct in not intervening in [the] assault

33

.... fell within the ambit of State-agent immunity." <u>Ex parte Alabama Dept. of Mental Health and Mental Retardation</u>, 937 So.2d at 1028-29.  Or, to put it another way, according to the court, "Johnson and Marshall do not show that their actions fall within the performance of a function that clearly entitles them to State-agent immunity."  <u>Id</u>. at 1029.

<u>Ex parte Alabama Dept. of Mental Health and Mental Retardation</u> controls here.  Similarly, Webb, Terrell, and Andrews offer only conclusory statements as to why they failed to monitory, supervise, and protect D.S.: that, "As child care officers, [they] are responsible for supervising the youths in detention and for security in the detention area," and that, "In doing so, [they] are responsible for making reasoned decisions based on the given situation that occurs with the residents." Defendants' brief (Doc. No. 69), p.37.  They neglect to explain, however, how the given situation concerning D.S. warranted their total abdication of their responsibility

as on-duty childcare officers to monitor, supervise, and protect D.S. and C.P. at all times while they were in the daycare room; or, to be more specific using the words of Ex parte Alabama Dept. of Mental Health and Mental Retardation, they neglect to explain how "they were adhering to a specific rule or regulation applicable to the incident," 937 So.2d at 1028, when they failed to notice that D.S. and C.P. had left the daycare room; they failed, despite the one-person-only-in-the-restroom rule, to prevent D.S. from following D.S. into the restroom; they failed to remove the toilet paper that covered the window between the restroom and the control room and thus blocked their view; they failed to respond to D.S.'s yells for help, despite the fact, as they admit, that the yells should have been audible in the control room; they were either reading the paper or working on a computer when D.S. and C.P. left the restroom. Webb, Terrell, and Andrews, in short, "do not show that their actions [or inactions] fall within the performance of a function that

clearly entitles them to State-agent immunity."  Id. at

1029.[13]

    With regard to D.S.'s placement-in-general-population

claim and failure-to-provide-prompt-medical-care claim,

D.S. had not shown what role, if any, Webb, Terrell, and

_____

    13. D.S. also contends that Webb, Terrell, and
Andrews are not "peace officers" within the ambit of § 6-
5-338(a).  Subsection (b) of § 6-5-338 states that:

> "This section is intended to extend
> immunity only to peace officers and
> governmental units or agencies
> authorized to appoint peace officers.
> No immunity is extended hereby to any
> private non-governmental person or
> entity, including any private employer
> of a peace officer during that officer's
> off-duty hours."

1975 Ala. Code § 6-5-338(b).  Webb, Terrell, and Andrews
admit that they are "not municipal or county peace
officers in the truest sense," but argue that they are
otherwise entitled to immunity because they were
"assuming custody over youths charged with criminal
offenses, enforcing laws of the State of Alabama and
maintaining order throughout the juvenile detention
facility."  Defendants' brief in support of motion for
summary judgment (Doc. No. 69), p. 32.  The court, while
seriously doubting that Webb, Terrell, and Andrews fall
within § 6-5-338(a)'s coverage, need not reach this
issue.  Because § 6-5-338(a) immunity and Cranman
immunity have been merged, the court has looked solely to
Cranman.

36

Andrews (either together or separately) played in the circumstances giving rise to these claims.  Webb, Terrell, and Andrews are therefore entitled to summary judgment on these claims.


## 2. Mason

Mason contends that she is entitled to immunity on all of D.S.'s state claims.  The court agrees.  As an MCYF intake officer, Mason was responsible for determining whether the MCYF could properly assert jurisdiction over juveniles brought to the facility, whether there was probable cause that the juvenile committed criminal conduct, and whether the juvenile should be detained at the facility.  Unlike with Webb, Terrell, and Andrews, the evidence reflects that Mason's actions and decisions were totally within the confines of her authority.  Mason was not responsible for assigning D.S. to a particular MCYF wing or for his care thereafter; that task was delegated to others.  Aside

37

from her general commitment responsibilities, Mason was, at most, responsible for recommending further psychiatric evaluation of D.S., which she did in this case.

The evidence also reflects that, on learning that D.S. had been raped, Mason immediately directed MCYF staff to take him to a doctor. While, unfortunately, D.S. was not taken to a doctor, there is nothing in the record to support the conclusion that her responsibilities extended beyond what she did.

Mason has, therefore, established as to all three of D.S.'s state claims (placement-in-general-population claim, failure-to-protect claim, and failure-to-provide-prompt-medical-care claim) that her actions and decisions were consistent with her authority and responsibilities and thus fell squarely within the discretionary categories set forth in Cranmen. E.g., 792 So.2d at 405 ("A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the

agent's ... (3) discharging duties imposed on a department or agency by statute, rule, or regulation insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner ....").

The burden, therefore, is now on D.S. to show that she acted in a manner that precludes application of the immunity, see Cranman, 792 So.2d at 405 ("a State agent shall not be immune from civil liability in his or her personal capacity ... when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law"), and D.S. has not met this burden. Summary judgment will therefore be granted on all of D.S.'s state claims against Mason.

### 3. Montgomery County

Montgomery County argues that, to the extent D.S.'s claims against it rest solely on respondeat-superior

39

theory, it too is immune from tort liability because its sued employees are entitled to immunity.   It is true that, "under principles of vicarious liability, where a municipal employee enjoys immunity, the municipality likewise is immune as to claims based on the employee's conduct." City of Bayou La Batre v. Robinson, 785 So. 2d 1128, 1131 (Ala. 2000).

The county's argument is, however, unavailing as to D.S.'s failure-to-protect claim because, as previously discussed, the childcare officers on duty when D.S. was raped are not immune from his state claims; but the argument has merit on D.S.'s placement-in-general-population claim and failure-to-provide-prompt-medical-care claim.   The county, therefore, may not take cover in their immunity to avoid respondeat-superior liability on D.S.'s failure-to-protect claim, but may do so on D.S.'s placement-in-general-population claim and failure-to-provide-prompt-medical-care claim.[14]

_____

14. To be sure, the court does not understood D.S. to
(continued...)

The county asserts, however, that D.S. may not recover punitive damages from it, and D.S. acknowledges this to be true.

Summary judgment will therefore be granted as to the county on D.S.'s state placement-in-general-population claim and failure-to-provide-prompt-medical-care claim and for punitive damages on the failure-to-protect claim; summary judgment will be denied in all other respects on the failure-to-protect claim.[15]

----

14. (...continued)
say that his claims against the county are necessarily predicated solely upon respondeat-superior liability. D.S.'s claims that the county failed to implement adequate screening and segregation criteria for violent, mentally retarded, or mentally ill juveniles and failed to provide adequate supervision may be direct-liability claims as well. See, e.g., Carpenter v. Mobile County, 841 So. 2d 1237, 1239-40 (Ala. 2002) (holding that a county may be directly liable for death of a pretrial detainee if the county negligently failed to provide for the secure custody, care, and safekeeping of the deceased).  However, the evidence does not support these factual allegations against the county directly.

15. The county also contends that there is a cap on any damages recoverable from it under state law.  The court need reach this issue at this time.

## C. Official Capacities

Webb, Terrell, and Andrews contend that, because the county has been named as a defendant on both D.S.'s federal and state claims and because claims against governmental employees in their official capacities are functionally equivalent to claims against the entity they represent, it is redundant and thus unnecessary to sue them in their official capacities.   The court agrees. Monell v. Department of Social Servs., 436 U.S. 658, 690 n. 55 (1978); Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991); Haley v. Barbour County, 885 So.2d 783, 788 (Ala. 2004).   Summary judgment will therefore be granted against Webb, Terrell, and Andrews on all of D.S.'s federal and state claims to the extent they have been sued in their official capacities.

*** 

42

For the reasons given above and in summary, Webb, Terrell, Andrews Webb, Mason, and Montgomery County's motion for summary judgment will be granted in part and denied in part as follows: Summary judgment will be denied on D.S.'s federal failure-to-protect claim against Webb, Terrell, and Andrews in their individual capacities; this claim will proceed to trial. Summary judgment will be denied on D.S.'s state failure-to-protect claim against Webb, Terrell, and Andrews in their individual capacities and against Montgomery County except as to punitive damages; this claim will proceed to trial except as to punitive damages against Montgomery County. Summary judgment will be granted in all other respects, that is, summary judgment will be granted on the federal failure-to-protect claim against Mason and the county; on the state failure-to-protect claim against Mason; on the state failure-to-protect claim against the county to the extent punitive damages are sought; on the state placement-in-general-population and failure-to-

43

provide-prompt-medical-care claims against Mason and the county; and on all federal and state claims to the extent Webb, Terrell, Andrews, and Mason have been sued in their official capacities. Mason is no longer a party to this case.

An appropriate judgment will be entered.

DONE, this the 16th day of November, 2007.


   /s/ Myron H. Thompson   
UNITED STATES DISTRICT JUDGE